UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **SHANNON M. JOHNSON** | * | **CIVIL ACTION NO. 15-1078** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **BERRY PLASTICS CORP.** | * | **MAG. JUDGE KAREN L. HAYES** |

RULING

This is an employment discrimination and retaliation action brought by Plaintiff Shannon M. Johnson ("Johnson") against his former employer, Berry Plastics Corp. ("Berry"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* and the Louisiana Employment Discrimination Law ("LEDL"), LA. REV. STAT. § 23:301, *et seq.* Johnson raised three claims against Berry: (1) Berry violated Title VII and the LEDL by paying black employees less than white employees, (2) Berry violated Title VII by retaliating against him by instructing quality control employees to find fault with his work, and (3) Berry violated Title VII by discharging him in retaliation for filing an EEOC charge.

Berry filed a Motion for Summary Judgment [Doc. No. 22]. Johnson filed a memorandum in opposition to the motion. [Doc. No. 26]. Berry filed a reply memorandum. [Doc. No. 27].

For the following reasons, the Motion for Summary Judgment is GRANTED, and Johnson's claims are DISMISSED WITH PREJUDICE.

I.     FACTS

In 1993, after graduating from high school, Johnson began working for Sunbelt, a manufacturing

plant in Monroe, Louisiana. He was terminated in 1995 for poor attendance.

However, in 2002, he returned to work at the plant.[1] At some point, the plant was acquired by Tyco.

On April 3, 2007, Berry, which owns and operates manufacturing plants in and outside North America, acquired the Monroe, Louisiana plant from Tyco. Berry hired the incumbent Tyco workforce, including Johnson and his purported comparator, Jimmie Weaver ("Weaver"), who is white, at the same positions they held with Tyco.

Berry and Tyco paid different hourly rates for many positions. However, after the acquisition, Berry continued to pay the Monroe employees at the higher Tyco hourly rates. Johnson had been employed by Tyco as a Senior Operator with an hourly rate of $11.32, and he continued in this position and with this hourly rate under Berry. Weaver had been employed as a Team Leader with Tyco with an hourly rate of $15.00, and he continued in this position and with this hourly rate under Berry as well.

On July 15, 2007, Johnson resigned his employment with Berry to accept another position with a former employer.

In May 2008, Johnson contacted Gary Lilly ("Lilly") about any job openings at Berry. Lilly conferred with Tim Shambro ("Shambro"), Berry's Production Manager, but no Senior Operator positions were available.[2] Berry did have an opening for Packer, an unskilled labor position, at an hourly rate of $8.16. Johnson was offered the position, and he accepted.

---

[1] It is unclear if the plant was still Sunbelt at this time.

[2] Johnson claims that Shambro had told him at the time of his resignation that he would be able to return to his Senior Operator position with the company at the same rate if he returned within a year. However, Johnson did not file an EEOC or otherwise assert a claim based on this alleged assurance when he returned to work in 2008.

Between his re-employment with Berry in 2008 and his termination, Johnson's hourly pay increased from $8.16 to $14.98. During this time, he was awarded two promotions, first to Senior Operator in 2009 and then to Team Leader in 2010. In every year other than 2011 (when he had a disciplinary action and a low performance rating), Johnson received merit increases.

In 2010, the Berry facility became ISO certified. To keep this certification, Berry was required to have written procedures for handling production matters. One such policy was the Control of Nonconforming Product Policy.

Team Leaders, like Johnson, are responsible for the production of any machine they oversee. During this time, Johnson reported to Tony Masters ("Masters"), the Shift Supervisor. The Monroe facility also had a Quality Department, consisting of the Quality Manager, Paul Perkins, and employees who served as Quality Auditors. The Quality Auditors are charged with checking products as they come off production to determine if they are defective. If the Quality Auditor finds a defective product, he or she then consults with the Team Leader to identify the product that needs to be removed from production. The Quality Auditor then inspects to determine that the defective product has been fully removed. Only a supervisor or a Quality Department employee is authorized to put a product which appears defective back into production.

In the summer of 2012, Johnson complained to Laurie King ("King"), Berry's Human Resources Generalist, that his hourly rate was too low because he should have been re-hired at a higher rate of pay, and Weaver received a higher rate of pay. King investigated Johnson's complaint, but found that Weaver's higher hourly rate was justified.

While Johnson was serving as Team Leader, but prior to the filing of a charge of discrimination, he was the subject of six disciplinary actions, including a suspension for poor quality.

3

On May 9, 2013, Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") under #846-2013-33753. Johnson believes that Berry received notice of the EEOC charge between July 9 and 19, 2013.

After Johnson filed an EEOC charge, he was the subject of six more disciplinary actions. On July 26, 2013, Masters issued a verbal warning to Johnson for his admitted failure to complete a first piece inspection when an order started. On December 9, 2013, Masters suspended Johnson for three days without pay and issued a Last Chance Agreement to him for violating ISO standards and violating the Code of Business Ethics. Johnson was captured on video removing some product from a reject area to the High Density Production Area.[3]

On February 16, 2014, Berry extended the Last Chance Agreement because Johnson violated overtime scheduling policies by switching shifts with another employee without approval. Although Johnson is unsure what impact switching shifts may have on overtime, he admits that one of Berry's major customers has placed limits on the number of hours an employee can work during the week.

On February 20, 2014, Berry issued a verbal warning to all Team Leaders, including Johnson, because scrap goals were missed. Johnson admits that the goals were missed, and all Team Leaders received a verbal warning.

On March 24, 2014, Johnson filed a second EEOC charge under #461-2014-00755, alleging that Berry retaliated against him.

On June 21, 2014, Berry issued another verbal warning to Johnson because, under his leadership, non-conforming product that should have been scrapped was sent to a customer. Johnson

---

[3]Johnson was captured on video moving the product, but he claimed that another employee, Perry Chambers, helped him. According to Berry, it was a different employee, Brandon Hutson, who walked alongside him, but Johnson moved the product on his own.

4

admits that he had to be written up for this incident.

On August 21, 2014, Berry issued another verbal warning to Johnson because he failed to report to mandatory training on July 29, 2014. Although Johnson does not recall the discipline, he does not dispute that he signed the discipline form and does not dispute that he missed the training.

On December 8, 2014, the Quality Department discovered bags that were supposed to be 48 inches in length were actually a non-conforming length of 46 inches. As the Team Leader, Johnson was required to inspect the product for length, and he had completed a checklist indicating that he had done so, and the product was in compliance. Team Leaders are required to perform a "recording check" every two hours, and they often do spot checks in between. Barbara Watt ("Watt"), Senior Lead in the Quality Department presented the quality checklist and non-conforming product to Johnson who admitted that he had only conducted an initial check at the beginning of the run, but had not performed other checks. Watt and Johnson both provided statements to Berry, and Johnson admitted in his statement that he had performed a "spot check, but nothing [thorough]." [Doc. No. 22-3, Johnson Depo., p. 147 & Exh. 24].

However, Johnson contends that he checked the length at the beginning, and it should have stayed the same. If Johnson had pulled the bin, he would have checked, but Terrence Johnson, his assistance, pulled the bin, and he believes that Terrence Johnson should have checked the length. He further contends that another Berry employee, Harlon Matthews ("Matthews"), had told him that if he found a non-conforming product to correct it or switch with others. Matthews does not deny that he may have told Johnson a different procedure in the past, but the procedure has been as described since the plant became ISO certified in August 2010. [Doc. No. 23-10].

The following day, on December 9, 2014, Johnson's supervisor, Masters, and the Quality Control Manager, Paul Perkins ("Perkins'), were walking through the high density extrusion

5

department between approximately 2:45 and 3:00 p.m. when an employee, Jackie McCartery ("McCartery") called Masters aside. As they approached the Team Leader office, Perkins and Master both individually observed Johnson sitting in a chair in the office with his eyes closed, and he appeared to both men to be asleep. McCartery walked to the office and opened the door in a loud manner, appearing to wake Johnson. Perkins and Masters reported the incident to Human Resources. King investigated the incident, speaking with McCartery, who stated that he did not know whether Johnson was asleep. Johnson denies that he was asleep, but that he had notified another employee that he was ill with a migraine headache, which makes his eyes light sensitive.

King conferred with the Regional Human Resource Manager Cindy Newman, the Plant Manager George Puckett ("Puckett), and Vice President for Human Resources, Jeff Bennett. They decided to terminate Johnson. On December 12, 2014, Johnson was notified of his termination by Puckett verbally and by King in writing.

On January 14, 2015, the EEOC issued a Notice of Right to Sue, which Johnson received on or about January 20, 2015.

On April 4, 2015, Johnson notified Berry of his intention to file suit pursuant to state law. On April 8, 2015, Johnson filed a Complaint [Doc. No. 1] in this Court, which was amended on May 14, 2015 [Doc. No. 3]. The Amended Complaint, which superseded the original Complaint stated claims for discriminatory pay practices under state and federal law and retaliatory discipline and discharge under federal law.

On March 11, 2016, Berry filed the instant Motion for Summary Judgment [Doc. No. 22]. Johnson filed a memorandum in opposition [Doc. No. 26]. On April 29, 2016, Berry filed a reply memorandum [Doc. No. 27].

**II.    LAW AND ANALYSIS**

A.  **Motions for Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Thus, Summary Judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994) ("Testimony based on conjecture or speculation is insufficient to raise an issue of fact to defeat a

summary judgment motion because 'there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'").

### B. Discriminatory Pay

Title VII prohibits an employer from discharging or otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1).

The LEDL also prohibits race discrimination in employment.[4] LA. REV. STAT. § 23:332 ("It shall be unlawful discrimination in employment for an employer to engage in any of the following practices: (1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to compensation, or terms, conditions, or privileges of employment, because of the individual's race . . . .").

In this case, Johnson asserts that he was subjected to race discrimination because Berry paid black employees less than they did white employees.

In Title VII employment discrimination cases in which there is no direct evidence, a plaintiff may rely on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). As "[b]oth Title VII and Louisiana employment discrimination statutes prohibit . . . discrimination[] and retaliation, . . . Louisiana courts routinely look to federal law for guidance in determining whether a viable claim has been asserted." *Smith v. Amedisys Inc.*, 298 F.3d

---

[4]Berry also moved for summary judgment on Johnson's state law pay claims on the basis that they were untimely. Johnson argues that his lawsuit would have been premature prior to the issuance of the notice of right to sue on his last EEOC charge. Given the Court's analysis and conclusions, the Court need not address the timeliness of Johnson's state law claim based on the alleged pay disparity between Johnson and Weaver. Even if the claims are timely filed, he has failed to raise a genuine issue of material fact for trial on his state or federal pay disparity claims.

434, 440 (5th Cir. 2002); *see also, La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 477 (5th Cir. 2002); *King v. Phelps Dunbar, L.L.P.*, No. 98-C-1805 (La. 06/4/99), 743 So.2d 181, 187 (citing *Bustamento v. Tucker*, 607 So.2d 532, 538, n. 6 (La.1992)).

"To make out a prima facie case of discrimination in compensation, a plaintiff must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility." *Taylor v. United Parcel Service, Inc.*, 554 F.3d 510, 522 (5th Cir. 2008) (citing *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984)); *see also Goring v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. College,* 414 Fed. App'x. 603, 633 (5th Cir. 2011) (citing *Taylor*, 544 F.3d at 522). A plaintiff's prima facie evidence must show that his "pay was lower than specific employees who are not members of the protected class." *Taylor*, 544 F.3d at 523. Further, the plaintiff "has the burden of demonstrating that 'the employment actions at issue were taken under nearly identical circumstances.'" *Frazier v. Sabine River Authority La.*, 509 Fed. App'x. 370 (5th Cir. 2013) (quoting *Turner v. Kan. City S. Ry.*, 675 F.3d 887, 893 (5th Cir. 2012)). The Fifth Circuit has explained that "nearly identical circumstances" are those where the comparator employees "'held the same job or responsibilities, shared the same supervisor, or had their employment status determined by the same person, and have essentially comparable violation histories.'" *Id.*

If plaintiff meets his prima facie burden, then the employer must produce a legitimate non-discriminatory reason for the pay disparity. *Id.* at 522 (citing *Ross v. University of Texas at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998) (internal quotation marks omitted)).

When the employer satisfies this requirement, the burden of proof then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the

9

reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed motive alternative."). *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004)(internal citations omitted).

In this case, Johnson has failed to establish a prima facie case of discrimination based on pay disparity. Johnson is a member of a protected class as an African-American, and he has alleged that he was paid less than white employees. More specifically, he has argued that a white employee, Weaver, who also held the position of Team Leader was paid a higher hourly rate. At first blush, this evidence would appear to be sufficient for Johnson to meet his prima facie burden. However, it is undisputed that Weaver had fifteen years of experience as a Team Leader while Johnson had only three. Thus, Johnson has failed to establish that he and Weaver were employed in nearly identical circumstances.[5]

Further, even if Johnson could make out a prima facie case of discrimination, Berry has produced legitimate, non-discriminatory reasons for the differences in the rates of pay for Johnson and Weaver. King, its human resources employee, investigated Johnson's complaints and found no pay disparity. When Berry acquired Tyco in 2007, Johnson was working as a Senior Operator, and Berry continued to pay him the grandfathered rate of $11.32 per hour until his voluntary resignation in 2007. When Johnson re-applied to Berry, there were no Senior Operation or comparable positions

---

[5]In his deposition, Johnson also claimed that Berry discriminated against him by failing to re-hire him at the same rate he was paid when he resigned. He claimed that Larry Watson, Jeff Killebrew, John Guillilee, Tony Masters, and April Shipp were all hired back into their former positions at the same rate of pay. It appears to the Court that he no longer asserts these claims, but relies solely on his comparison to Weaver. However, to the extent his state and federal pay disparity claims are based on Berry's alleged discriminatory failure to re-hire him at the same rate of pay, he cannot survive summary judgment. Johnson was re-hired in 2008, but did not timely file a charge of discrimination with the EEOC or the State Human Rights Agency. Thus, he failed to exhaust his administrative remedies with regard to this claim, he cannot do so now, and he cannot proceed with an unexhausted claim in this lawsuit.

available. Instead, he chose to return to a lower level position with a corresponding lower hourly rate of pay. Although he eventually promoted to Team Leader, he had no prior experience in this position.

In contrast, at the time that Berry acquired Tyco, Weaver had been employed continuously since 1998 and was working as a Team Leader at a rate of $15.00 per hour.[6] By the time of King's investigation, Weaver had been working as a Team Leader for almost fifteen years, whereas Johnson had only been a Team Leader for three years.

In response to Berry's legitimate, non-discriminatory reasons for the pay differential, Johnson failed to produce evidence to show that the reasons are false, or that the reasons, while true, are only part of the motivation for the difference, and another motivating factor was Johnson's race. In fact, in addition to the objective differences between Johnson's and Weaver's employment history, the undisputed evidence shows that after Johnson returned to work for Berry at a lower level position, he received two promotions, and his pay increased from $8.16 to $14.98 per hour. Johnson pointed to no evidence whatsoever that Berry's reasons for his hourly rate of pay were pretext for discrimination or were part of a mixed motive.[7] Accordingly, Berry is entitled to summary judgment on Johnson's pay disparity claims under federal and state law. The Motion for Summary Judgment on these claims is GRANTED, and the claims will be DISMISSED WITH PREJUDICE.

---

[6]In Plaintiff's Response to Statement of Material Facts, Johnson states that "Jimmy Weaver also left the defendant's employment and returned, thereby giving up his 'grandfathered status.'" [Doc. No. 26-2, p.1 (citing Doc. No. 26-4, Deposition of Shannon Johnson, pp. 49-56)]. The cited deposition pages do **not** support this statement. Further, earlier in his deposition, Johnson admits that he was referring to the re-hiring of other co-workers, not Weaver. [Doc. No. 26-4, Johnson Depo., p. 31 ("Q: Do you know when Jimmy Weaver was rehired? A: No, sir. I don't know . . . Jimmy Weaver is not in this statement.")]. Although the Court has found that Weaver is not an appropriate comparator for other reasons, there is no evidence that Weaver left his employment with Berry and later returned.

[7]Berry also produced evidence that Weaver, like Johnson, had been denied an annual merit increase because of a disciplinary action, further demonstrating the lack of discriminatory intent.

### C. Retaliation

Title VII prohibits an employer from discriminating against an employee because he has opposed an employment practice that is unlawful under Title VII or testified in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a).

Retaliation claims under Title VII are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). To establish a *prima facie* case of unlawful retaliation, Johnson must show: (1) that he engaged in protected activity; (2) that he was subjected to a materially adverse employment action; and (3) that there is a causal connection between the protected activity and the materially adverse employment action. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); *see also Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir.2001). Materially adverse employment actions are actions which are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington,* , 548 U.S. at 57. At the prima facie stage, "the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard." *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001) (quoting *Long*, 88 F.3d at 305 n. 4 ). Temporal proximity alone, if "very close, can in some instances establish a prima facie case of retaliation[,]" but "temporal proximity standing alone can[not] be sufficient proof of but for causation." *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

If a plaintiff establishes a prima facie case, the *McDonnell-Douglas* burden shifting framework then applies. *Haire v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 367 (5th Cir. 2013) (citing *Evans*, 246 F.3d at 354). The employer will be required to produce legitimate, non-retaliatory reasons for its employment act. If the employer meets its burden

of production then the plaintiff must show that "the retaliation was a 'but for' cause of the adverse employment decision." *Haire*, 719 F.3d at 368 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n. 4 (5th Cir.1996) (internal quotation marks omitted)). At this stage, in order to "defeat a motion for summary judgment, a Title VII plaintiff . . . must show there is a conflict in substantial evidence on this ultimate issue." *Id.* at 368-69 (citing *Long*, 88 F.3d at 308) (inset quotation marks omitted). "'Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'" Id. at 369 (quoting Long, 88 F.3d at 308).

In this case, Johnson raises two bases for his retaliation claims: (1) that he was subjected to retaliatory discipline for filing his EEOC charges and (2) that he was ultimately discharged for filing EEOC charges.

### 1.     **Retaliatory Discipline**

Berry moves for summary judgment on Johnson's claim that he was subjected to retaliatory discipline for a filing an EEOC charge. Berry does not deny that Johnson engaged in protected activity, but contends that he failed to show that the complained-of discipline constituted materially adverse actions. Further, even if Johnson could make out a prima facie case of retaliation, Berry argues that he cannot establish that "but for" the filing of his EEOC charge, he would not have been disciplined, i.e., that Berry's reasons for terminating him were pretext for a retaliatory motive.

In order to maintain its ISO certification, Berry must maintain and secure compliance with certain policies. As a result, Berry regularly coaches and disciplines employees for violations. Both

before and after Johnson filed an EEOC charge, Berry disciplined him. Because there was a "pattern of regular discipline and coaching," Berry argues that its continuation of discipline could not constitute materially adverse actions. Berry contends that Johnson as much as admitted this fact when he testified that he is the type of person to "speak up" if "there's something that's not right" without fearing that he would lose his job. [Doc. No. 22-3, Johnson Depo., p. 68].

Johnson failed to respond specifically to Berry's argument. However, the Court has considered the record before it and finds that Johnson was subjected to materially adverse actions which would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Whether an action is materially adverse is judged from the objective, reasonable person standard. *See Burlington*, 548 U.S. at 68 ("We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective."). Even if Johnson is the type of person to speak up about perceived injustice, the focus is not on his individual personality, but on whether a reasonable person would be dissuaded. It appears true, from the record and the deposition testimony of employees and former employees, that Berry regularly counsels and disciplines employees for production problems. Counseling and verbal reprimands alone may not rise to the level of materially adverse actions, but Berry ignores the fact that Johnson's discipline included a three-day unpaid suspension and imposition of a Last Chance Agreement. An unpaid suspension would dissuade a reasonable worker from making or supporting an EEOC charge. Thus, Johnson can establish this element of his prima facie case.

Even if Johnson met his prima facie burden[8], Berry presented legitimate, non-retaliatory

---

[8] Berry does not raise an argument on causal connection at the prima facie burden, but proceeds to the final step of the analysis–the "but for" causation. The Court does the same.

reasons for the disciplinary actions taken prior to Johnson's termination. *See* Facts Section, pp. 4-5, *supra*. Thus, Johnson may proceed to trial only if he has presented evidence sufficient to show that the disciplinary actions would not have been taken against him but for the filing of his EEOC charge. Johnson has failed to meet this burden.

First, Johnson is not an employee with an unblemished record prior to the filing of his EEOC charge. The record is clear that Johnson had disciplinary actions both before and after he filed an EEOC charge. This is not a case where an employee with no disciplinary history is subjected to adverse actions only after he engages in protected conduct.

Second, Johnson cannot establish temporal proximity between Berry's notice of his charge and a materially adverse action. He filed his EEOC charge in May 2013, and he alleges that Berry received notice of the charge in July. However, the first materially adverse action administered by Berry, the three-day unpaid suspension and imposition of the Last Chance Agreement, was not imposed until December 2013,[9] approximately six months after Berry received notice of the EEOC charge. Thus, there is no temporal proximity to provide evidence of a retaliatory motive.[10] *See Hypolite v. City of Houston, Tex.*, 493 F. App'x 597, 607 (5th Cir. 2012) ("A causal connection based on temporal proximity can be shown when the adverse employment action occurs up to four months

---

[9]Johnson was subjected to a disciplinary action in July after Berry allegedly received notice of the EEOC charge, but it was only a verbal warning for his **admitted** failure to complete a first piece inspection when an order started. This action does not rise to the level of a materially adverse action.

[10]Although temporal proximity alone is not sufficient to show but-for causation, it may be considered, along with other evidence, to meet the required showing. *See Strong v. University Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007). For example, the Fifth Circuit pointed out that in *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992), the plaintiff relied not only on temporal proximity, but also on her complete lack of disciplinary history, the fact that she was quickly fired for incidents for which no evidence existed, and the disparaging comments her boss had made about her EEOC complaint. *Strong*, 482 F.3d at 808.

15

after the protected conduct.") (citing *Evans*, 246 F.3d at 354 (citation omitted)); *cf. Ajao v. Bed Bath and Beyond, Inc.*, 265 Fed. App'x 258, 265 (5th Cir. 2008) ("Temporal proximity of four months is not close enough, without additional supporting summary-judgment evidence, to establish a causal connection between the employment action and the protected conduct.").[11]

Finally, Johnson's attempts to rely on the statements of his former co-workers to establish pretext also fail. He relies heavily on the testimony of his former co-worker, Johnny McGee ("McGee"), a current Berry employee, that Berry supervisors sought to have Quality Department employees find fault with his work. While McGee's beliefs may be sincere, he has offered nothing more than speculation and hearsay and double hearsay statements from other co-workers to support those beliefs. The identified co-workers, Brenda Belton ("Belton"), Robin Thomas ("Thomas") and Stephanie Williams ("Williams")[12] either deny being present for a conversation with Johnson and/or McGee, deny making any statements that Johnson needed to be careful or watch out, and/or deny being told by Perkins to find things that Johnson had done wrong.[13] *See* [Doc. Nos. 22-6, Williams Depo.,

---

[11]The cases cited by the Court refer to the use of temporal proximity to prove a causal connection at the prima facie stage. Berry chose to by-pass that argument, and, as set forth in in footnote 10, the Court agrees that temporal proximity alone could not establish but-for causation. Nonetheless, the cases are instructive. The Court notes that Berry refers to the period of time between Johnson's protected conduct and the disciplinary action as being four months, but the Court is unclear how it arrived at that time period.

[12]Williams was also known as Stephanie Carter at some point during her employment.

[13]Thomas' alleged statement to McGee that unidentified "people" were out to get Johnson is clearly inadmissible hearsay. [Doc. No. 23- McGee Depo., pp. 30-32]. If Perkins made the statements about which Johnson and McGee testify, those statements would be admissible as the statement of a party opponent's agent or employee on a matter within the scope of that relationship, FED. R. EVID. 801(d)(2). However, the alleged report of these statements by another person to McGee and/or Johnson adds another layer of hearsay. Johnson has failed to establish that statements by Belton, Thomas, or Williams were admissible as statements as the agent of a party opponent's agent or were made within the course of their employment and thus also excepted from the hearsay rule.

16

pp. 8-10; 22-7, Thomas Depo., pp. 11-12; 22-11, Belton Declaration, ¶¶ 3]. Neither Johnson nor McGee heard Perkins or any other Berry supervisor make statements about efforts to find fault with Johnson's work in an effort to "get him" for filing the EEOC charge. Johnson simply cannot meet his burden by relying on speculation, beliefs, and innuendo. Therefore, Berry's Motion for Summary Judgment on this claim is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 2. Retaliatory Discharge

Finally, Johnson asserts that he was subjected to the ultimate act of retaliation when he was discharged by Berry on December 14, 2014. Berry moves the Court for summary judgment on this claim because it was not raised in his Complaint or Amended Complaint, he failed to exhaust his administrative remedies, and he cannot establish causation or pretext.

Berry is correct that Johnson failed to assert retaliatory discharge in either his original Complaint or his Amended Complaint. However, even if a party raises a claim for the first time in response to a motion for summary judgment, the Court cannot refuse to consider the claim, but must treat the claim as a motion for leave to amend his pleadings under Federal Rule of Civil Procedure 15(c). Under Federal Rule of Civil Procedure 15(a), "a party may amend the party's pleading only by leave of court" and "leave to amend shall be freely given when justice so requires." *Engstrom v. First Nat'l Bank*, 47 F.3d 1459, 1464 (5th Cir. 1995) (quoting FED. R. CIV. P. 15(a)). The Court has the discretion to grant or deny leave to amend, but that discretion "does not permit denial of a motion to amend unless there is a substantial reason to do so," such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility of the amendment. *Leffall v. Dallas Indep.*

*Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994) (citing references omitted); *see also In re Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996).

Berry argues that the Court should not allow Johnson to further amend his Amended Complaint to assert a claim of discriminatory discharge because such amendment would be futile when Johnson failed to exhaust his administrative remedies under Title VII by either filing a new EEOC charge or amending his second EEOC charge to include this claim. Johnson did not seek leave of Court to file a sur-reply and has not responded to this argument.

Under Title VII, a plaintiff is required to exhaust his administrative remedies prior to filing suit. The scope of his complaint, or amendments thereto, is limited by the scope of the charges made in the EEOC charge and the investigation that might reasonably be expected to grow out of that complaint. *Thomas v. Texas Dep't of Criminal Justice*, 220 F.3d 389, 395 (5th Cir.2000).

On his March 27, 2014 EEOC charge, Johnson checked the box indicating retaliation as the circumstances of the alleged discrimination and asserted the following facts in support of his claim:

> On May 9, 2013, I filed charge #846-2013-33753. On July 19, 2013, the company began retaliating against me. I was written upon August 14, 2013; and got cited on December 6, 2013 for a bin that me and a co-worker moved to the back for inspection. I was told by a co-worker that she was told to find anything negative on me so that the company cold have enough ammunition to fire me. . . . .
>
> No reason was given for the actions taken against me.
>
> I believe I have been retaliated against for filing the above charge in violation of Title VII . . . .

[Doc. No. 26-3, Exhibit 22].

Under these facts the Court finds that Johnson's claim for retaliatory discharge is encompassed in the scope of the EEOC charge. He alleged that he was retaliated against for filing his initial EEOC charge asserting a claim of race discrimination. He claimed that Berry had begun to retaliate against

18

him with the intent to "have enough ammunition to fire me." The fact that Berry then indeed did terminate Johnson is within the scope of the investigation that could reasonably be expected to arise out of the charge. Although Berry cites the Court to *Simmons-Myers v. Caesars Entertainment Corp.*, 515 Fed. App'x 269 (5th Cir. 2013), that case actually supports the Court's conclusion. The Fifth Circuit stated that "'a new theory of recovery [] can relate back to the date of the original charge when the facts supporting both the amendment and the original charge are essentially the same.'" *Id.* at 273 (quoting *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 879 (5th Cir. 2003)). Unlike the plaintiff in that case, Johnson's allegations would put both the EEOC investigators and Berry on notice that his termination was the result of retaliation, which he alleged was the very intent of Berry's discipline of him. Finally, the EEOC would have had the opportunity to consider this fact because the Notice of the Right to Sue did not issue until January 2015, the month following Johnson's termination.

Nevertheless, even if Johnson exhausted his administrative remedies on his retaliatory discharge claim and the Court grants leave to amend his Amended Complaint to add this claim, his claim does not survive summary judgment. He generally relies on the same evidence to show that his discipline prior to discharge and the discharge itself were retaliatory. Johnson raises only one additional argument: that the **lack of temporal proximity** is in and of itself evidence of pretext. He contends that "a jury could conclude a crafty employer would hide [sic] its time to avoid the appearance of temporal proximity." [Doc. No. 26, p. 4]. Although Johnson's argument is creative, the lack of temporal proximity between the filing of his EEOC charges and his discharge is not evidence of pretext according to Fifth Circuit precedent, which this Court is bound to follow. Thus, for the reasons stated in the retaliatory discipline section as well as for this additional reason, Johnson has failed to raise a genuine issue of material fact for trial that he would not have been discharged but for

his filing of EEOC charges. Accordingly, Berry's Motion for Summary Judgment on Johnson's retaliatory discharge claim is also GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### III. CONCLUSION

For the foregoing reasons, Berry's Motion for Summary Judgment [Doc. No. 22] is GRANTED, and Johnson's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 27th day of May, 2016.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE